FILED ___ RECEIVED
ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

JUN 2 6 2020

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:___ DEPUTY

DAVID L. JAFFE
Chief, Organized Crime and Gang Section
United States Department of Justice
KELLY PEARSON
Deputy Chief, Organized Crime and Gang Section
CHAD W. MCHENRY
ALEXANDER GOTTFRIED
Trial Attorneys, Organized Crime and Gang Section
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Kelly.Pearson@usdoj.gov
Chad.W.McHenry@usdoj.gov
Alexander.Gottfried@usdoj.gov

*Representing the United States of America*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **United States of America,** | Case No. 2:17-cr-306-JCM-VCF |
| Plaintiff, | **Plea Agreement Under Fed. R. Crim. P. 11(c)(1)(C)** |
| v. | |
| **Sergey Medvedev,** | |
| Defendant. | |

Plaintiff United States of America, by and through DAVID L. JAFFE, Chief

for the United States Department of Justice, Organized Crime and Gang Section,

KELLY PEARSON, Deputy Chief, Organized Crime and Gang Section, and CHAD

W. MCHENRY and ALEXANDER GOTTFRIED, Trial Attorneys, Organized Crime

and Gang Section; and the defendant, SERGEY MEDVEDEV, and the defendant's

1    attorney, LANCE MANINGO, ESQ., submit this Plea Agreement under Fed. R.

2    Crim. P. 11(c)(1)(C):

3    **I.    SCOPE OF AGREEMENT**

4         The parties to this Plea Agreement are the United States of America and SER-

5    GEY MEDVEDEV (the defendant). This Plea Agreement binds the defendant and

6    the United States Department of Justice's Organized Crime and Gang Section.

7         If the Court accepts this Plea Agreement, it will also bind the Court under

8    Fed. R. Crim. P.11(c)(1)(C).  It does not bind any other prosecuting, administrative,

9    or regulatory authority.

10        The Plea Agreement sets forth the parties' agreement regarding criminal

11   charges referenced in the Plea Agreement and applicable sentences, fines, restitu-

12   tion, and forfeiture.

13   **II.   DISPOSITION OF CHARGES AND WAIVER OF TRIAL RIGHTS**

14        A.    <u>Guilty Plea</u>. The defendant knowingly and voluntarily agrees to plead

15   guilty to the following charge as set forth in the Second Superseding Criminal In-

16   dictment returned by the grand jury on January 30, 2018 (ECF No. 303):

17              COUNT ONE:   Conspiracy to Engage in a Racketeer Influenced

18              Corrupt Organization, in violation of 18 U.S.C. §§ 1962(d) and 1963.

19        The defendant also agrees to the in personam criminal forfeiture money judg-

20   ment as set forth in the Plea Agreement, the Bill of Particulars, and the Forfeiture

21   Allegation of the Second Superseding Criminal Indictment.

22

B.   <u>Waiver of Trial Rights</u>. The defendant acknowledges that he has been advised and understands that by entering a plea of guilty he is waiving – that is, giving up – certain rights guaranteed to all defendants by the laws and the Constitution of the United States. Specifically, the defendant is giving up:

1.   The right to proceed to trial by jury on all charges, or to a trial by a judge if the defendant and the United States both agree;

2.   The right to confront the witnesses against the defendant at such a trial, and to cross-examine them;

3.   The right to remain silent at such a trial, with assurance that his silence could not be used against him in any way;

4.   The right to testify in his own defense at such a trial if he so chooses;

5.   The right to compel witnesses to appear at such a trial and testify on the defendant's behalf; and

6.   The right to have the assistance of an attorney at all stages of such proceedings.

C.   <u>Withdrawal of Guilty Plea</u>.  The defendant will not seek to withdraw his guilty plea after he has entered it in court, unless the Court declines to accept the parties' binding agreement.  See Fed. R. Crim. P. 11(c)(5)(B).

D.   <u>Additional Charges</u>. The United States agrees not to bring any additional charges against the defendant arising out of the defendant's participation in conduct described in the agreed-upon factual basis for this Plea Agreement, to the

3

1   extent that the defendant has disclosed such participation to the United States At-

2   torney's Office for the District of Nevada and/or the Organized Crime and Gang Sec-

3   tion of the United States Department of Justice (hereinafter collectively referred to

4   as "this Office") as of the date of this Agreement, except that the United States

5   reserves the right to prosecute the defendant for any criminal tax violations,

6   including conspiracy to commit such violations, chargeable under 18 U.S.C. § 371.

7        E.   <u>Dismissal of Charges</u>.  Defendant understands, acknowledges, and

8   agrees that as a result of his guilty plea pursuant to this agreement, at the time of

9   sentencing, the United States will move to dismiss the remaining eight counts of the

10   Second Superseding Indictment pending against him.

11  **III.   ELEMENTS OF THE OFFENSE**

12        COUNT ONE: The elements of Conspiracy to Engage in a Racketeer

13   Influenced Corrupt Organization, in violation of 18 U.S.C. § 1962(d) are:

14        1.    First, that there was an agreement among two or more persons to par-

15   ticipate in an enterprise that would affect interstate commerce through a pattern of

16   racketeering activity;

17        2.    Second, that defendant knowingly and willfully became a member of

18   that agreement; and

19        3.    Third, that the defendant or another member of the conspiracy agreed

20   to commit two racketeering acts.

21

22

## IV. FACTS SUPPORTING GUILTY PLEA

A. The defendant will plead guilty because he is, in fact and under the law, guilty of the crimes charged.

B. The defendant acknowledges that if he elected to go to trial instead of pleading guilty, the United States could prove his guilt beyond a reasonable doubt and by preponderance of the evidence establish its right to forfeit the specified property. The defendant further acknowledges that his admissions and declarations of fact set forth below satisfy every element of the charged offenses.

C. The defendant waives any potential future claim that the facts he admitted in this Plea Agreement were insufficient to satisfy the elements of the charged offense.

D. The defendant understands, acknowledges, and agrees that the facts set forth below are only those necessary to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in Section VI below, and that they do not capture the entirety of his conduct, criminal or otherwise, in this case. The defendant admits and declares under penalty of perjury that the facts set forth below are true and correct:

1. From on or about October 1, 2010, through on or about February 1, 2018, in the District of Nevada and elsewhere, defendant **MEDVEDEV** and his codefendants, including others known and unknown, were members of, employed by, and associated with the Infraud Organization described below, an enterprise engaging in, and the activities of which affected interstate and foreign commerce, and

1   unlawfully and knowingly conducted and participated, directly and indirectly, in the

2   conduct of the affairs of the Infraud Organization through a pattern of racketeering

3   activity described below:

4         a.    The Infraud Organization was a criminal enterprise that

5   existed to enrich its members and associates through acts of identity theft and

6   financial fraud, including, but not limited to, acts involving trafficking in stolen

7   means of identification; trafficking in, producing, and using counterfeit identification

8   documents; identity theft; trafficking in, producing, and using unauthorized and

9   counterfeit access devices; bank fraud; and trafficking in the services associated with

10   the use of unauthorized counterfeit access devices; and which activities interfered

11   with interstate and foreign commerce. The Infraud Organization facilitated the sale

12   of contraband by its members, including counterfeit documents, stolen bank account

13   and credit account information, and stolen personal identifying information.

14   Members and associates of the Infraud Organization operated throughout the world

15   and the United States, to include Las Vegas, Nevada.

16         b.    From on or about October 1, 2010 to on or about February

17   6, 2018, the Infraud Organization was responsible for the sale and/or purchase of

18   over 4 million compromised credit and debit card numbers.   The actual loss

19   associated with the Infraud Organization was in excess of $568 million USD.  The

20   victims of the Infraud Organization include MasterCard, Visa, American Express,

21   and Discover Card corporations, in addition to countless financial institutions

22   located in the United States.

1              c.      The purposes of the Infraud Organization included: to
2    enrich its members and associates through the unlawful trafficking in means of
3    identification, document-making implements, counterfeit identification documents,
4    device-making equipment, and unauthorized and counterfeit access devices; to
5    establish the Infraud Organization as the premier online destination for the
6    purchase and sale of stolen property and other contraband, such as victims' personal
7    and financial means of identification; to educate members in obtaining and using
8    such property and contraband; to direct traffic, primarily through advertising and
9    member feedback, to member owned and/or operated automated vending sites
10   ("AVSes") and other websites to generate illicit proceeds, thereby promoting the
11   Infraud Organization as the premier online source of reputable contraband vendors;
12   to protect the Infraud Organization and its members from detection, apprehension,
13   and prosecution by law enforcement; to preserve and protect Infraud operations and
14   profits through the use of discipline, expulsion, and other acts of retribution; and to
15   preserve and protect the reputation, operations, and profits of the enterprise through
16   discipline, expulsion, and other acts of retribution against non-conforming members.
17             d.      Members of the Infraud Organization trafficked in,
18   produced, and transferred counterfeit identification documents; possessed
19   document-making implements; transferred, possessed, and used means of
20   identification of another person in the commission of and in connection with bank
21   fraud affecting interstate and foreign commerce; possessed fifteen (15) or more
22   counterfeit and unauthorized access devices affecting interstate and foreign

7

commerce; trafficked in and possessed device-making equipment affecting interstate and foreign commerce; planned schemes to unlawfully obtain money and property from banks and other financial institutions by way of fraud and material misrepresentations and promises; and utilized the personal identifying information of victims in the forgery and false use of passports and other identification documents and authentication features.

e.    Members of the Infraud Organization used various means to communicate, complete transactions, and establish connections, all of which were designed to protect the membership's anonymity, evade detection and prosecution by law enforcement, and provide security for the criminal organization against attacks by other rival criminal organizations, including the use of: various website forums controlled by the Infraud Organization, as online gathering places which provided secure meeting locations for the members of the criminal enterprise; private messaging, which is a non-forum wide message sent between individual members on the criminal organization's website forums; e-mail, some of which are encrypted and password protected, or use service providers located outside of the United States; ICQ chat, which is a free instant messaging electronic communication service; proxies, which are achieved by bouncing from one computer to another to hide a member's true originating IP address; Virtual Private Networks, which are similar to proxies, but with the addition of creating an encrypted to prevent the communications within that tunnel from being intercepted and monitored; and

1   protected drop sites in the United States and elsewhere, in the event that there was

2   a need to transport, transfer, and receive physical contraband.

3           f.   Members of the Infraud Organization have defined roles

4   in the enterprise, including Administrator, Moderator, Reviewers, Vendors, and

5   Members.

6           i.   The Administrators of the Infraud Organization

7   were individuals that served as a governing council for the Infraud Organization

8   who, collectively, controlled the destiny of the organization.  The Administrator(s)

9   initially seeded the Infraud Organization forum with "reputable" vendors of

10  contraband in order to attract traffic and membership and grow the organization.

11  They handled the day-to-day management decisions of the Infraud Organization, as

12  well as long term strategic planning for its continued viability.  They determined

13  which individuals were permitted to become and remain members of the Infraud

14  Organization; the functions, responsibilities and levels of access to information for

15  all members of the organization; and the rewards accorded to members for their

16  loyalty to the organization as well as the punishments meted out to members

17  evidencing disloyalty to the organization.  Furthermore, they decided when, how and

18  under what circumstances to attack and retaliate against members of rival criminal

19  organizations and their associated internet websites.  The Administrator(s) were

20  accorded full access to, and privileges on, the computer servers that hosted the

21  Infraud Organization's websites, and, thus, had the ultimate responsibility for the

22  physical administration, maintenance, and security of those servers and websites.

9

    ii.  Super Moderators oversaw and administered one or-more subject-matter specific areas on the Infraud Organization's forum that either fell within an area of their expertise or covered their geographic location, limiting their activities to editing and deleting posts by members on these forums and mediating disputes. Super Moderators frequently served as reviewers for particular products or services with which they had an expertise.

    iii.  Moderators, like Super Moderators, oversaw and administered one or more subject-matter specific areas on the Infraud Organization's forum that either fell within an area of their expertise or covered their geographic location. However, Moderators tended to be more limited in the authority they were granted, and were generally limited to moderating one or two specific sub-forums.

    iv.  Vendors sold illicit products and services to members of the Infraud Organization. These sales could occur through the vendor's own website to which would-be purchasers were directed by the advertisements they paid for and placed on the Infraud Organization's web forum. Such sales could also occur directly between the vendor and customer, *i.e.* via email, private message, or ICQ chat. Products sold by vendors were reviewed on the forum by Infraud members to ensure that vendors of low-quality goods did not remain in business with the Infraud Organization. This helped cement the organization's reputation as a premiere online destination for safe, high-quality, and readily available fraud-related contraband.

1              v.     VIP Members were some of the premiere members

2 of the Infraud Organization. The leaders of the organization bestowed this title upon

3 longstanding or otherwise notable members in order to distinguish them from the

4 general membership and from vendors.

5              vi.     Members of the Infraud Organization typically

6 used the organization's websites to gather and provide information about

7 perpetuating criminal activity; to share information with and solicit other members

8 to engage in their criminal schemes; to use the website's vendor to facilitate their

9 unlawful purchases of credit card dumps, false identification documents, and other

10 contraband; and to have their individual disputes with other organization members

11 settled by the Administrators or Moderators.

12              g.     On or about October 2010, defendant **MEDVEDEV**, along

13 with his codefendant, Svyatoslav Bondarenko, created the Infraud Organization.

14 **MEDVEDEV** was an Administrator of the Infraud Organization. **MEDVEDEV**

15 used the nickname "Stells" on the organization's websites. **MEDVEDEV** also

16 operated the official Infraud "escrow" service, which was used by the membership to

17 facilitate the purchase and sale of contraband. In addition, he operated an

18 "exchanging" service, which was used by members to convert digital currencies to

19 different types of digital currencies, and to "cash out" digital currencies to real-world,

20 or fiat, currencies.

21              h.     As part of the conspiracy, defendant **MEDVEDEV** agreed

22 that he or a co-conspirator would engage in two or more racketeering acts, including

11

1  violations of 18 U.S.C. § 1028(a)(1) (Trafficking in and Production of False

2  Identification Documents); 18 U.S.C. § 1028(a)(5) (Unlawful Possession of an

3  Authentication Feature); 18 U.S.C. § 1028(a)(7) (Unlawful Transfer, Possession or

4  Use of a Means of Identification for an Unlawful Activity); 18 U.S.C. § 1029(a)(3)

5  (Possession of 15 or More Unauthorized Access Devices); 18 U.S.C. § 1029(a)(4)

6  (Trafficking in and Possession of Access Device-Making Equipment); 18 U.S.C.

7  § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); and 18 U.S.C. § 1543 (Forgery

8  and False Use of a Passport).

9         i.     On or about December 2010, defendant **MEDVEDEV**

10 posted details about the official "escrow" service he provided and the prices

11 associated with his services for Infraud members.  During the conspiracy period,

12 **MEDVEDEV**'s "escrow" service was used by numerous Infraud members in order to

13 purchase and sell contraband.

14        j.     From on or about October 2010 to on or about February,

15 2018, defendant **MEDVEDEV**, with and without co-defendant Bondarenko, invited

16 and incentivized individuals perceived to sell "high quality" contraband to advertise

17 on the Infraud forum; outlined the rules associated with the Infraud Organization;

18 controlled who was eligible to become a member of the Infraud Organization; set

19 uniform advertising prices for Infraud vendors; and reviewed membership comments

20 in order to determine whether or not to take action against alleged non-conforming

21 members, amongst other actions associated with the Infraud Organization.

22

12

1          k.     From in or about October 2010 to in or about May 2013,

2 defendant **MEDVEDEV** accepted monies for escrow services, advertisements, and

3 related Infraud business via his Liberty Reserve accounts, U7016017 and U9356830.

4 Those accounts received and sent approximately $1,040,517.84 USD.

5          l.     On or about April 16, 2016, defendant **MEDVEDEV**

6 posted to the Infraud forum an explanation that co-defendant Bondarenko had gone

7 missing, and that he, **MEDVEDEV**, was now the "admin and owner" of the Infraud

8 Organization.

9          m.     On or about July 22, 2016, defendant **MEDVEDEV** posted

10 to the Infraud forum indicating that the organization had an "open invite" policy,

11 and that members would be able to secure invitations for their associates into the

12 Infraud Organization, provided that the would-be new members met minimum

13 standards.

14          2.     Defendant **MEDVEDEV** expressly admits that: 1) a loss amount

15 of $568,000,000 is attributable to the defendant for conspiring with a member of the

16 enterprise; 2) the offense, Conspiracy to Engage in a Racketeer Influenced Corrupt

17 Organization, involved more than 10 victims; 3) a substantial part of the offense

18 Conspiracy to Engage in a Racketeer Influenced Corrupt Organization, was

19 conducted overseas and otherwise used sophisticated means; and 4) the offense,

20 Conspiracy to Engage in a Racketeer Influenced Corrupt Organization, involved

21 possession and use of device-making equipment, and the production of and traffick-

22 ing in unauthorized and counterfeit access devices.

3.     Defendant **MEDVEDEV** admits that the property listed in Section X is (a) any interest acquired or maintained from his criminal violations, (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he established, operated, controlled, conducted, or participated in the conduct of his criminal violations, or (c) any property constituting, or derived from, any proceeds obtained, directly or indirectly, via racketeering activity or unlawful debt collection in his criminal violations.  The property and the criminal forfeiture money judgment of $1,044,701.41 are therefore facilitating property and proceeds of the crime.

4.     Defendant **MEDVEDEV** further expressly admits that the acts set forth above, among others: were knowingly and voluntarily committed in further-ance of the Infraud Organization's criminal enterprise; constitute a pattern of racketeering activity; were committed in and affecting interstate and foreign com-merce; and were done for the gain of the Infraud members, the benefit of others, and in furtherance of the Infraud criminal enterprise.

## V.     COLLATERAL USE OF FACTUAL ADMISSIONS

The facts set forth in Section IV of this Plea Agreement shall be admissible against the defendant under Fed. R. Evid. 801(d)(2)(A) at sentencing for any purpose.  If the defendant does not plead guilty or withdraws his guilty plea, the facts set forth in Section IV of this Plea Agreement shall be admissible at any proceeding, including a trial, for impeaching or for rebutting any evidence, argument, or representation offered by or on the defendant's behalf.  The defendant

1  expressly waives all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410

2  regarding the use of the facts set forth in Section IV of this Plea Agreement.

3  **VI.   APPLICATION   OF   SENTENCING   GUIDELINES   (U.S.S.G.) PROVISIONS**

4

5      A.   <u>Count One: Conspiracy to Engage in a Racketeer Influenced Corrupt Organization</u>

6          1.   Base Offense Level [U.S.S.G. § 2B1.1(a)(2)]:   7

7

8          2.   Specific Offense Characteristics:

9          More than $550,000,000 in loss [U.S.S.G § 2B1.1(b)(1)(P)]:   +30

10         Offense involves more than 10 victims [U.S.S.G. § 2B1.1(b)(2)(A)]:   +2

11

12         Substantial part of offense conducted overseas and otherwise used sophisticated means [U.S.S.G. § 2B1.1(b)(10)]:   +2

13

14         Offense involved possession and use of device-making equipment, and production and trafficking of unauthorized and counterfeit

15         access devices [U.S.S.G. §§ 2B1.1(b)(11)(A), (B)]:   +2

16         3.   <u>Adjustments</u>:

17         Organizer/Leader of 5 or more [U.S.S.G. §3B1.1(a)]:   +4

18

19         4.   Adjusted Offense Level:   **47**

20     The defendant acknowledges that the statutory maximum sentence and any

21 statutory minimum sentence limit the Court's discretion in determining the

22 defendant's sentence notwithstanding any applicable Sentencing Guidelines

1  provisions.  The defendant understands that although the parties agree to recom-

2  mend a prison sentence of no greater than ten (10) years, the Court may defer a

3  decision whether to accept or reject the Plea Agreement until the Court has re-

4  viewed the presentence report, in which the United States Probation Office will in-

5  dependently calculate the defendant's offense level under the Sentencing Guidelines.

6      B.   Reduction of Offense Level for Acceptance of Responsibility.  Under

7  U.S.S.G. § 3E1.1(a), the United States will recommend that the defendant receive a

8  two-level downward adjustment for acceptance of responsibility unless he: (a) fails

9  to truthfully admit facts establishing a factual basis for the guilty plea when he

10  enters the plea; (b) fails to truthfully admit facts establishing the amount of

11  restitution owed when he enters his guilty plea; (c) fails to truthfully admit facts

12  establishing the forfeiture allegations when he enters his guilty plea; (d) provides

13  false or misleading information to the United States, the Court, Pretrial Services, or

14  the Probation Office; (e) denies involvement in the offense or provides conflicting

15  statements regarding his involvement or falsely denies or frivolously contests

16  conduct relevant to the offense; (f) attempts to withdraw his guilty plea; (g) commits

17  or attempts to commit any crime; (h) fails to appear in court; (i) violates his

18  conditions of pretrial release; or (j) commits any act which could result in the United

19  States seeking an obstruction of justice enhancement within the meaning of U.S.S.G.

20  § 3C1.1.

21      Under U.S.S.G. § 3E1.1(b), if the Court determines that the Defendant's total

22  offense level, before operation of § 3E1.1(a), is 16 or higher, and if the United States

1    recommends a two-level downward adjustment pursuant to the preceding para-

2    graph, the United States will move for an additional one-level downward adjustment

3    for acceptance of responsibility before sentencing because the defendant communi-

4    cated his decision to plead guilty in a timely manner that enabled the United States

5    to avoid preparing for trial and to efficiently allocate its resources.

6         The parties agree that if an adjusted offense level of **47** applies, and if a

7    3-level reduction for acceptance of responsibility is applied, the applicable offense

8    level may be **44**, which provides for a minimum advisory sentencing guideline range

9    of **life**, which may be adjusted depending on the defendant's criminal history

10   category established by the Court.  The parties agree that the statutory maximum

11   for a conviction of RICO Conspiracy, in violation of 18 U.S.C. § 1962(d), is twenty

12   (20) years imprisonment.

13        C.    <u>Criminal History Category</u>.  The defendant acknowledges that the

14   Court may base his sentence in part on the defendant's criminal record or criminal

15   history.  The Court will determine the defendant's Criminal History Category under

16   the Sentencing Guidelines, and the Criminal History Category could result in an

17   increase in the advisory guideline range.

18        D.    <u>Relevant Conduct.</u>  The Court may consider any counts dismissed

19   under this Plea Agreement and all other relevant conduct, whether charged or

20   uncharged, in determining the applicable Sentencing Guidelines range and whether

21   to depart from that range.

22

17

1      E.    <u>Additional Sentencing Information</u>.   The stipulated Sentencing

2 Guidelines calculations are based on information now known to the parties.  The

3 parties may provide additional information to the United States Probation Office

4 and the Court regarding the nature, scope, and extent of the defendant's criminal

5 conduct and any aggravating or mitigating facts or circumstances.  Good faith efforts

6 to provide truthful information or to correct factual misstatements shall not be

7 grounds for the defendant to withdraw his guilty plea.

8      The defendant acknowledges that the United States Probation Office may

9 calculate the Sentencing Guidelines differently and may rely on additional

10 information it obtains through its investigation.  The defendant also acknowledges

11 that the Court may rely on this and other additional information as it calculates the

12 Sentencing Guidelines range and makes other sentencing determinations, and the

13 Court's reliance on such information shall not be grounds for the defendant to with-

14 draw his guilty plea.

15 **VII.  APPLICATION OF SENTENCING STATUTES**

16      A.    <u>Maximum Penalty.</u>

17      <u>Count One.</u> The maximum penalty for Conspiracy to Engage in a Rack-

18 eteer Influenced Corrupt Organization, in violation of 18 U.S.C. §§ 1962(d) and 1963,

19 is not more than twenty (20) years in prison, a fine of not more than two hundred

20 and fifty thousand dollars ($250,000), or both a fine and imprisonment.

21      B.    <u>Factors Under 18 U.S.C. § 3553.</u> The Court must consider the factors

22 set forth in 18 U.S.C. § 3553(a) in determining the defendant's sentence.  However,

1  the statutory maximum sentence and any statutory minimum sentence limit the

2  Court's discretion in determining the defendant's sentence.

3        C.     <u>Parole Abolished.</u>  The defendant acknowledges that his prison sen-

4  tence cannot be shortened by early release on parole because parole has been abol-

5  ished.

6        D.     <u>Supervised Release.</u>  In addition to imprisonment and a fine, the de-

7  fendant will be subject to a term of supervised release not to exceed three (3) years

8  as to Count One.  Supervised release is a period of time after release from prison

9  during which the defendant will be subject to various restrictions and requirements.

10 If the defendant violates any condition of supervised release, the Court may order

11 the defendant's return to prison for all or part of the term of supervised release,

12 which could result in the defendant serving a total term of imprisonment greater

13 than the statutory maximum prison sentence.

14       E.     <u>Special Assessment.</u>  The defendant will pay a one-hundred dollar

15 ($100.00) special assessment per count of conviction at the time of sentencing.

16       F.     <u>Additional Costs.</u>  The defendant is required to pay for the costs of

17 imprisonment, probation, and supervised release, including the costs for electronic

18 monitoring of home detention, unless the defendant establishes that the defendant

19 does not have the ability to pay such costs, in which case the Court may impose an

20 alternative sanction such as community service.

21

22

1   **VIII.  POSITIONS REGARDING SENTENCE**

2          This Plea Agreement is governed, in part, by Federal Rule of Criminal Proce-

3   dure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the

4   Court shall include a term of imprisonment of 10 years (120 months) in the custody of

5   the Bureau of Prisons. Because this plea is offered pursuant to Federal Rule of Crim-

6   inal Procedure 11(c)(1)(C), if the Court accepts the plea agreement, the Court may

7   not impose a different sentence than that agreed by the parties in this plea agree-

8   ment.

9          The Court may accept this agreement, reject it, or defer a decision until the

10  Court has reviewed the presentence report. If the Court accepts and agrees to impose

11  a sentence of 10 years' (120 months') imprisonment, defendant may not withdraw this

12  plea as a matter of right under Federal Rule of Criminal Procedure 11(d). If, however,

13  the Court rejects the Plea Agreement, or otherwise refuses to accept defendant's plea of

14  guilty, either party shall have the right to withdraw from this Plea Agreement. The

15  Court will advise the defendant that if the Court rejects the guilty plea, and his plea

16  of guilty is not withdrawn, the disposition of the case may be less favorable than that

17  contemplated by this plea agreement.

18  **IX.     RESTITUTION**

19         The defendant and the government agree, and request that the Court find on

20  the record, that the number of victims in this case is so large as to make restitution

21  impracticable. *See* 18 U.S.C. § 3663A(c)(3)(A). Moreover, the defendant and the

22  government agree, and request that the Court find on the record, that determining

20

1  complex issues of fact related to the cause or the amount of those victims' losses

2  would complicate or prolong the sentencing process to a degree that the need to

3  provide restitution to any victim is outweighed by the burden of the sentencing

4  process. *See* 18 U.S.C. § 3663A(c)(3)(B).

5          Therefore, the defendant and government agree that the Court should order

6  in lieu of restitution a fine in the amount of $568,000,000 pursuant to 18 U.S.C.

7  § 3571(d). Any payments made by the defendant toward the amount of this fine shall

8  be deposited into the Crime Victims Fund pursuant to 34 U.S.C. § 20101.

9          The defendant understands, acknowledges and agrees that he cannot

10  discharge this fine obligation through bankruptcy proceedings. The defendant

11  further understands, acknowledges and agrees that fine payments and obligations

12  cannot offset or reduce the amount of any forfeiture judgment imposed in this case.

13  **X.      FORFEITURE**

14          The defendant knowingly and voluntarily:

15          A.      Agrees to the District Court imposing an in personam criminal forfei-

16  ture money judgment of $1,041,517.84;

17          B.      Agrees the in personam criminal forfeiture money judgment amount

18  complies with *Honeycutt v. United States*, ___U.S.___, 137 S. Ct. 1626 (2017);

19          C.      Waives his right to any abandonment proceedings, any civil adminis-

20  trative forfeiture proceedings, any civil judicial forfeiture proceedings, or any crimi-

21  nal forfeiture proceedings of the in personam criminal forfeiture money judgment

22  (proceedings);

1       D.    Waives service of process of any and all documents filed in this action

2   or any proceedings concerning the in personam criminal forfeiture money judgment

3   arising from the facts and circumstances of this case;

4       E.    Agrees not to file any claim, answer, petition, or other documents in

5   any proceedings concerning the in personam criminal forfeiture money judgment;

6       F.    Waives the statute of limitations, the CAFRA requirements, Fed. R.

7   Crim. P. 7, 11, and 32.2, all constitutional requirements, including, but not limited

8   to, the constitutional due process requirements of any proceedings concerning the in

9   personam criminal forfeiture money judgment;

10       G.    Waives all constitutional, legal, and equitable defenses to the in perso-

11   nam criminal forfeiture money judgment in any proceedings, including, but not lim-

12   ited to, (1) constitutional or statutory double jeopardy defenses and (2) defenses un-

13   der the Excessive Fines or Cruel and Unusual Punishments Clauses of the Eighth

14   Amendment to the United States Constitution;

15       H.    Agrees to the entry of an Order of Forfeiture for the in personam crim-

16   inal forfeiture money judgment to the United States;

17       I.    Waives the right to appeal any Order of Forfeiture;

18       J.    Agrees the in personam criminal forfeiture money judgment is imme-

19   diately due and payable and is subject to immediate collection by the United States;

20       K.    Agrees and understands the in personam criminal forfeiture money

21   judgment shall not be treated as satisfaction of any assessment, fine, restitution,

22

1   cost of imprisonment, or any other penalty the Court may impose upon the defendant

2   in addition to the forfeiture;

3        L.     Acknowledges that the amount of the forfeiture may differ from, and

4   may be significantly greater than or less than, the amount of restitution; and

5        M.    Agrees to take all steps as requested by the United States to pass clear

6   title of any forfeitable assets that may be used to satisfy the in personam criminal

7   forfeiture money judgment to the United States and to testify truthfully in any judi-

8   cial forfeiture proceedings. The defendant understands and agrees that the in perso-

9   nam criminal forfeiture money judgment amount represents proceeds and/or facili-

10  tating property of illegal conduct and is forfeitable. The defendant acknowledges that

11  failing to cooperate in full in the disclosure of assets constitutes a breach of this Plea

12  Agreement.

13  **XI.   FINANCIAL INFORMATION AND DISPOSITION OF ASSETS**

14       Before or after sentencing, upon request by the Court, the United States, or

15  the Probation Office, the defendant will provide accurate and complete financial

16  information, submit sworn statements, and/or give depositions under oath concern-

17  ing his assets and his ability to pay. The defendant will surrender assets he obtained

18  directly or indirectly as a result of his crimes, and will release funds and property

19  under his control in order to pay any fine, forfeiture, or restitution ordered by the

20  Court.

21

22

1    **XII.    THE DEFENDANT'S ACKNOWLEDGMENTS AND WAIVERS**

2    A.    <u>Plea Agreement and Decision to Plead Guilty</u>.  The defendant

3    acknowledges that:

4    1.    He has read this Plea Agreement and understands its terms and

5    conditions;

6    2.    He has had adequate time to discuss this case, the evidence, and

7    this Plea Agreement with his attorney;

8    3.    He has discussed the terms of this Plea Agreement with his

9    attorney;

10    4.    The representations contained in this Plea Agreement are true

11    and correct, including the facts set forth in Section IV; and

12    5.    He was not under the influence of any alcohol, drug, or medicine

13    that would impair his ability to understand the Agreement when he considered sign-

14    ing this Plea Agreement and when he signed it.

15    The defendant understands that he alone decides whether to plead guilty or

16    go to trial, and acknowledges that he has decided to enter his guilty plea knowing of

17    the charges brought against him, his possible defenses, and the benefits and possible

18    detriments of proceeding to trial.  The defendant also acknowledges that he decided

19    to plead guilty voluntarily and that no one coerced or threatened him to enter into

20    this Plea Agreement.

21    B.    <u>Waiver of Appeal and Post-Conviction Proceedings</u>.  The defendant

22    knowingly and expressly waives: (a) the right to appeal any sentence imposed within

24

1    or below the applicable Sentencing Guideline range as determined by the Court;

2    (b) the right to appeal the manner in which the Court determined that sentence on

3    the grounds set forth in 18 U.S.C. § 3742; and (c) the right to appeal any other aspect

4    of the conviction or sentence and any order of restitution or forfeiture.

5         The defendant also knowingly and expressly waives all collateral challenges,

6    including any claims under 28 U.S.C. § 2255, to his conviction, sentence, and the

7    procedure by which the Court adjudicated guilt and imposed sentence, except non-

8    waivable claims of ineffective assistance of counsel.

9         The defendant reserves only the right to appeal any portion of the sentence

10   that is an upward departure from the sentencing guideline range determined by the

11   Court.

12        The defendant acknowledges that the United States is not obligated or re-

13   quired to preserve any evidence obtained in the investigation of this case.

14        C.    Removal/Deportation Consequences.  The defendant understands and

15   acknowledges that if he is not a United States citizen, then it is highly probable that

16   he will be permanently removed (deported) from the United States as a consequence

17   of pleading guilty under the terms of this Plea Agreement.  The defendant has also

18   been advised if his conviction is for an offense described in 8 U.S.C. § 1101(a)(43), he

19   will be deported and removed from the United States and will not be allowed to

20   return to the United States at any time in the future. The defendant desires to plead

21   guilty regardless of any immigration consequences that may result from his guilty

22   plea, even if the consequence is automatic removal from the United States with no

25

1   possibility of returning. The defendant acknowledges that he has specifically dis-

2   cussed these removal/deportation consequences with his attorney.

*- The rest of this page left intentionally blank. -*

## XIII.  ADDITIONAL ACKNOWLEDGMENTS

This Plea Agreement resulted from an arms-length negotiation in which both parties bargained for and received valuable benefits in exchange for valuable concessions.  It constitutes the entire agreement negotiated and agreed to by the parties.  No promises, agreements or conditions other than those set forth in this agreement have been made or implied by the defendant, the defendant's attorney, or the United States, and no additional promises, agreements or conditions shall have any force or effect unless set forth in writing and signed by all parties or confirmed on the record before the Court.

DAVID L. JAFFE
Chief, Organized Crime and Gang Section
United States Department of Justice

DATE:  6/17/2020

/s/ Chad McHenry
KELLY PEARSON
Deputy Chief, Organized Crime and Gang Section

CHAD W. MCHENRY
ALEXANDER GOTTFRIED
Trial Attorneys

DATE:  3|7|20

SERGEY MEDVEDEV
Defendant

DATE:  3/9/20

LANCE MANINGO, ESQ
Counsel for Defendant MEDVEDEV